## Leroy Cotton v. The State.

1—The right to a change of venue is not a constitutional right, such as the right to trial by jury. It is a mere legal right, and to be claimed only on the terms and under the qualifications prescribed in or reasonably deducible from the law. .

2—The affidavit of a defendant, supported by the affidavits of two credible persons of the county, alleging the existence of one or both of the grounds for change of venue defined in Art. 2994 of Paschal's Digest (viz: great prejudice or influential combinations against the accused,) will warrant the defendant to submit his application to the District Court, but he does not thereby become entitled to a change of the venue.

3—By the same statute the district judge is made the sole and irresponsible arbiter of the truth or falsity, sufficiency or insufficiency of the causes thus alleged by the accused; and in exercising his judgment he is not circumscribed by a legal discretion which this court can supervise, nor is any method prescribed by which he shall enlighten his understanding or arrive at his conclusion on the application.

4—It is competent for the district judge, in deciding an application for a change of venue, to act upon his own knowledge of the truth or falsity of the alleged causes, or of the degree of credit due to the affidavits filed in support of it, so that, however regular the application, he may lawfully overrule .it without any proof whatever, and his action can not be revised by .this court. Hence, it was not error in the District Court to receive counter-affidavits against an application for a change of venue, nor to refuse to hear additional affidavits in support of it.

5—But it seems that if the district judge refused to hear and consider an application duly made for a change of venue, such refusal would be error and an abuse of his legal discretion, which this court could correct.

6—If the District Court erroneously refuses a continuance, a bill of exceptions must be taken, or the error is waived; but this rule should not be held inflexible in a criminal case, and especially in a capital felony, if the record evinces a case of doubtful guilt.

7—A juror, summoned in a capital case and under examination as to his qualifications, stated "that he would be influenced by the testimony, but at present, from what he had heard, he thought the young men were guilty." Being asked by the court, "Could he render an impartial verdict, and on the testimony alone?" he answered "I could;" and being further asked by the court, "Would the partial opinion at present held by him influence his verdict upon the testimony?" he answered "It would not." The accused objected to the juror as incompetent, but the court held him competent, and the accused excepted to the ruling and challenged the juror peremptorily. *Held,* that the ruling was not error of which the accused could complain, unless it compelled him to accept an objectionable juror after exhausting all his peremptory challenges.

8—The court minutes of a trial for murder recited that the jury were "duly sworn 'well and truly to try the issue between the State of Texas and the defendant, and a true verdict render in accordance with the law and the evidence.'" *Held,* to be sufficient as showing that the jury were duly sworn, and the purpose for which they were sworn, but not to import a copy *in hæc verba* of the oath which was administered to them, and which need not be set out in the record.

APPEAL from the Criminal Court of Galveston. Tried below before the Hon. W. R. Fayle.

At the March term, (1869) of the Criminal Court of Galveston county, Leroy Cotton, the appellant, and Henry Cotton, his brother, were jointly indicted for the murder of John B. Lockman, on the 11th day of January, A. D. 1869.

A severance was asked by the accused and allowed by the court, and the State elected to proceed first with the trial of the appellant, Leroy Cotton.

A special venire was ordered, returnable March 30, 1869. On this last day the defendants, Leroy and Henry Cotton, applied to the court for a change of the venue; but their application was overruled and they excepted. It appears by the transcript that the original motion for the change of venue was "cut from the papers," and thus lost or destroyed, before the transcript for appeal was made out; but at the next term of the court, held in September, 1869, the appellant, then under sentence, moved for and obtained an order of court to substitute and embody in the transcript substantial copies of the original motion and affidavits so lost. This

substituted motion is in the name of the appellant alone, as follows :

"Now comes Leroy Cotton, a severance having been granted, and moves the court to grant him a change of venue, and says : That immediately after the alleged killing of Major Lockman, the newspapers of the city of Galveston published detailed accounts of what purported to be the facts of the case, with severe strictures against the defendant, which accounts were exaggerated, partial and not the true facts in the case; that the newspaper accounts thus published so inflamed the public mind that a mob was about to take the defendant out of the custody of the sheriff, who had the prisoner confined in the jail of Galveston county. The danger from said mob was so great that the defendant, through his friends, applied to Col. Cram, the military commander of the post of Galveston, to protect him in the hands of the sheriff. That for these and other causes :

"1. That there exists in the county of Galveston so great a prejudice that he can not obtain a fair and impartial trial.

"2. That there is a dangerous combination against him, instigated by influential persons, by reason of which he can not expect a fair trial. Supported by the affidavit of defendant, and of Wm. M. Williams and John J. Kirwan, citizens and residents of Galveston county.

(Signed,)                         "LEROY COTTON,
                                  "WM. M. WILLIAMS,
                                  "JOHN J. KIRWAN."

(The jurat follows, certified by the clerk.)

The affidavits of the defendant and of J. W. Henderson, Esq., who, as counsel, drew the original motion, together with a certificate of certain of the counsel for the State, were filed with the foregoing substituted motion, deposing to its substantial conformity with the lost original.

Next in the transcript follows the order of the court substituting these papers and making them part of the record; after which the minutes proceed with a statement of what trans-

pired on the submission of the original motion to the court, as follows:

"And after argument of counsel the court called Col. Cram, a by-stander, and had him sworn, who testified that he had sent a guard, upon the request of Judge Scott, to the jail of Galveston county, but being informed that the sheriff could protect the prisoner, the guard returned to camp. The attorney for the prosecution then, under the direction of the court, asked Col. Cram if, from his intercourse with the citizens of Galveston and acquaintances officially, he believed the prisoner could get a fair and impartial trial in Galveston county, to which the defendant objected, and was overruled by the court; and the witness proceeded to state that he believed he could get a fair and impartial trial. The attorneys for the prosecution, under the direction of the court, then called Sheriff Dirks, of Galveston county, whom they offered as a witness to prove that said witness believed the defendants could get a fair and impartial trial in Galveston county, to which the defendant objected and was overruled by the court; and the witness testified that he did believe the defendants could get a fair and impartial trial in said county. The defendants then asked the court to permit the defendants to make an issue before the court, witness for witness, and the court refused the same, whereupon the defendants excepted, and the same is accordingly signed by the judge."

And next the transcript makes the further extract from the court minutes, to wit:

"*By Court.*—Col. Cram and Sheriff Dirks were asked, first, if they were acquainted with the general feeling existing in the community, and the sentiments of the people of Galveston county, to which question they replied that 'they were.'

"Also, that Williams, one of the parties who signed the affidavit for a change of venue, answered, upon question asked, that he was the brother-in-law of the accused.

"The witnesses introduced were for the purpose of enabling the court to determine as to the truth and sufficiency of the

causes assigned, and whether there did or did not exist such state of prejudice in the minds of the citizens of Galveston county, that the accused could not receive a fair and impartial trial.

"(Signed)          W. R. FAYLE, Judge."

The foregoing are the facts shown in the transcript with reference to the motion for change of venue, which figures as a principal question in the opinion of this court.

The special venire was ordered on the 22d of March, 1869, and on the next day the defendant, on affidavits filed, asked for and obtained detachments for three persons who were alleged to be material witnesses for the defense, and to be then absent in certain other counties. The attachments were made returnable on the 31st of March, being the next day after the return day of the venire. But on the 31st of March the panel being still incomplete, the defendant filed his affidavit for a continuance, alleging diligence in his efforts to obtain the attendance of witnesses for whom the attachments were ordered, and the continual absence of one of them, R. B. Ridgeley, by whom he expected to prove "that on the evening and day of the alleged killing, the deceased abused and outraged the defendant, Leroy Cotton, and assaulted him by drawing a six-shooter on the defendant, Leroy Cotton; that on the night of the alleged killing the deceased went to the house of Maggie Mitchell, armed with a six-shooter pistol, with the avowed purpose of attacking the defendant, Leroy Cotton, whom the deceased knew was at said house."

In further support of the motion the affidavit alleged the absence of other witnesses, residents of Galveston, subpœnas for whom were returned "not found," and by whom the defendant would be able to prove that one of the State's witnesses could not be believed upon his oath.

This application for a continuance was overruled by the court, and the minutes of the court state that the defendant excepted, but no bill of exceptions to this ruling appears in the transcript.

The motions for a change of venue and for a continuance having been overruled, the trial proceeded on the plea of not guilty, entered by the accused.

The principal evidence introduced on the trial was as follows :

Maggie Mitchell, for the State, testified that on the night of the murder, defendant, Leroy Cotton, came to her house previous to the arrival of Major Lockman ; deceased was in the habit of visiting her house every night. On that particular night he came to bring her some money. She met him at the door and walked through the hall and dining-room with him into her bed-room, and that she had her arms around him ; soon after she got into her own room, the accused came in and said to the deceased, " You must retract what you have said ;" accused repeated this twice ; deceased threw up his hands, and, as he did so, accused placed his pistol against the side of deceased and commenced firing ; she was frightened, and ran into the closet ; after the firing ceased she returned ; saw Henry Cotton by the stove ; soon after the shooting the Cottons went out. Pion was her friend, and wanted to leave, but she asked him to remain, thinking some suspicion might attach to him ; she is positive there were five shots fired ; there might have been more ; several gentlemen came in company with Pion ; no other company present when the Cottons came ; is positive she heard five shots. Mr. White was in the room ; she took a paper from Mr. White and destroyed it ; found a derringer after the firing was over. The pistol of accused was against the side of deceased when he fired. The vest worn by the deceased will show the holes made by the ball. Witness kept possession of the clothing worn by deceased, for some time, and then delivered them to the officer of the court. (The clothes worn by Major Lockman at the time he was killed were here introduced and identified, and the holes made by the balls pointed out to the jury.) The witness was always to be found at home, when wanted.

Rush Hutchins was the next witness introduced. Witness

resides in Houston; was in Galveston on the 11th of January last. Is acquainted with the prisoner at the bar; knew the deceased; saw the accused and the deceased together the evening of the murder; they were together in the saloon of deceased; was in the saloon with a friend; heard Lockman curse accused and call him a s—n of a b—h; accused said to deceased he must retract that or he would shoot him; accused did not say when or where; does not remember anything more; was present at Maggie Mitchell's when the killing occurred, but did not see anything of it; was sitting with his back to the door; heard the shooting; got up and went into the hall; there was a crowd there, and a good deal of excitement; did not notice a pistol in the hands of either the Cottons; did not say that he knew more than he told before the coroner; said he could have told more; the threat made by the accused was made about dark; the killing occurred late in the night; must have been twelve o'clock; went into the room where the shooting had taken place; saw Major Lockman on the floor; he was then dying; saw his clothes taken off; does not know where the accused were, as he did not see them after they left the hall; never heard anything with reference to the previous difficulty; went to Maggie Mitchell's with the accused that night; saw them while under arrest in the morning. There were three or four shots fired.

In cross-examination by Col. Connally, the witness said he was not positive, but thinks there were three shots fired. Regarding the altercation between Lockman and Cotton in the saloon that evening, deceased had said the party was a d—d s—n of a b—h, and that accused could take it as he liked. Witness remarked to the deceased that his language was rather rough, to which deceased replied he meant what he said.

3. Joseph T. Wells, examined. Witness resides in Houston; is acquainted with the prisoner at the bar; knew the deceased by sight; never saw them together previous to the night of the murder; was present at Maggie Mitchell's when the killing took place; went in company with the prisoner; had only

come to Galveston that night; was in the parlor when the firing began in the next room ; was not thinking of any difficulty until he heard the shooting; saw Major Lockman come in with two other gentlemen; did not see any woman with him. Witness was in the parlor, talking with Fannie Wade; saw the Cottons in the parlor ; did not notice particularly what was going on, as he was not anticipating any difficulty; heard three or four shots fired, and saw Leroy Cotton come out of the room in which the shooting was done, but did not notice anything in his hands; saw Major Lockman on the floor; he was not dead then, but died in about ten minutes ; saw Leroy Cotton come out of the room into the hall, but did not hear him say anything; has told the jury all he knows. Leroy Cotton came out of the room immediately after the shooting ; saw no more of him. (Diagram of the room was here presented by counsel for the defence.) The witness saw Major Lockman come in through the hall, but did not see any woman with him. Thinks he would have noticed her ; one or two gentlemen walked into the bed room with deceased. Is positive that one or two gentlemen went into the room, but did not notice them come out; could not say particularly which one went in first, as he was not paying attention to what was going on; will not say positively that they went into the bed room; the firing commenced some two or three minutes after Major Lockman came into the house.

4. Mr. Bartlett sworn : Is acquainted with the accused ; knew the deceased; was present when the killing took place. Witness went into the place of business of deceased ; told witness he wanted to go to Maggie Mitchell's to get a shawl he had lent to one of the girls ; witness went in ahead of deceased, and stood by the stove; thought the deceased had gone up stairs. In a minute or two after he entered the parlor, the Cottons got up and went into the bed room. Bud Cotton was ahead with his pistol in his hand ; Henry Cotton was behind ; the firing began almost immediately. He said to Col. Craig, "We had better go;" heard two shots before he left, saw the

Cottons pass out of the room, found Major Lockman on the floor; Leroy Cotton had a pistol in his hand when he left the room; heard Henry Cotton say to Leroy, as he went into the room where Major Lockman was, "Now's your time!" and heard the firing immediately after; was ahead of deceased when they went to the house, and did not see him enter. Deceased said he was going to get a shawl he had loaned one of the girls, and did not anticipate any trouble; he was not to remain more than five or ten minutes; saw the body of deceased undressed, and recognized the clothing in court as that worn by him the night he was killed. The deceased had a pistol in his pocket; it had not been drawn, and was not cocked; the pistol was not in his pocket, but was stuck between the waistband of the pants and the shirt; saw the accused go out of the room towards the hall; the pistol Lockman had was a five or six shooter, and was probably ten inches in length; saw the pistol taken from the body of deceased, but did not know whether it was loaded; saw a pistol in the hand of Leroy Cotton, and thinks it was a six-shooter; one of the women in the house took the pistol from the body of Lockman, but does not know which one it was.

5. Dr. Kelly testified that he was called, on the night of the 11th of January last, to the house of Miss Maggie Mitchell, at about the hour of 12 o'clock. The person who came after witness told him that Major Lockman had been shot, and that he was wanted immediately. A carriage had been brought for him. On arriving at the house he was shown into what he was told was the private room of Maggie Mitchell. Found Major Lockman on the floor, very restless and uneasy. Witness asked deceased to remain quiet. Major Lockman looked up and recognized the witness, and said " Good evening, Doctor." Witness turned to get him some water, but when he handed it to him he was unable to swallow it. Examined the wounds superficially. He was wounded in three distinct places, all gunshot wounds. One entered the left side and passed through the body and entered the groin, and passed

through into the pelvis. Another ball passed through the thigh. There was also a wound in the face, made, he thought, by the cock of a pistol. The ball through the body was the one which produced death. It was undoubtedly the fatal one. Dr. Watts was with the deceased before witness. Major Lockman died from the wounds described, in the county of Galveston, on the 12th of January last. Made a memorandum of the occurrence, and took note of the property and effects removed from the body of the deceased. There was $196 25 in currency, $6 in silver, and three nickles—also a gold watch and chain. These articles were handed him as property of deceased by Maggie Mitchell.

6. Dr. Watts was the next witness: On the morning of the 12th of January last witness was sent for between 12 and 1 o'clock. Found deceased on his back on the floor. Discovered one gunshot wound in the thigh, below the groin. Found that a ball had passed through the body, entering just above the hip, on the left side, and coming out near the back-bone on the other side of the body. Deceased asked witness if he could help him. He was sinking fast then, was dying. The wound in the face was from the cock of a pistol. Saw the body stripped. A pistol was taken from it, which witness examined ; it was loaded, but not cocked; every barrel was loaded. The deceased recognized Dr. Kelly and himself, and asked for a glass of water. Major Lockman died from the wounds described. Witness is a practicing physician. He means by gunshot wounds, any and all wounds made by balls—a shot from gun or pistol. Surgeons call all such wounds gunshot wounds. From the range of the balls through the body, would suppose that one was fired from the left side, and the other from the front. *     *     *     *     *     *

Dr. Watts, recalled: Witness stated that the wound through the body was the fatal one. Not having probed the other wounds, could not say whether they were necessarily fatal or not. They could not have produced immediate death. When he first arrived, the friends of Major Lockman did not know

that he had received any other wounds than those produced by the small balls; found on examination that he had been shot through the body. Examined the marks of shot in the room; found there was a large ball in the bedstead. (Diagram was here presented, and witness explained the position of the room to the jury.)

In reply to a question from Col. Flournoy, witness said the door would be in the east end of the room, and the bed in the north end. The bed was about waist high. There was a pistol ball in the wall some six or seven feet from the floor. Deceased was an ordinary sized man; one of the balls passed through the thigh and lodged against the skin, ranging from the groin down. (Dr. Watts was, by permission of the court, sent to the house of Maggie Mitchell for the purpose of examining the marks of the balls on the walls.)

7. James Burns was the next witness, for the defense. He stated that on the night of the murder he was in front of the Imperial saloon, but having to collect some money from deceased, he repaired to his place of business. Heard Lockman say he did not think much of Bud Cotton, and that he would come across him some of these days, when he would put him out of the way. Met the accused in front of the Imperial saloon and told him to beware, for Lockman had been talking to witness about what had occurred.

On cross-examination this witness said he heard Lockman say that accused would come across him some day and that he would put him out of the way. Did not know what occurrence he meant; it was a fuss that had occurred at Maggie Mitchell's. Bud Cotton, when witness saw him in front of the Imperial saloon, was talking about something that had occurred between him and Maj. Lockman in the saloon. Did not know what it was about. Witness told accused what Lockman had said, because he came to engage his carriage. Had no other reason for holding the conversation with prisoner.

Dr. Watts, recalled: Diagram shown witness approximately correct. Witness explained the position to the jury. One shot

over the door, one in the bedstead, and one to the right of the door. The range of the shots in the wall appear to be upward. The one in the bed was nearly parallel ; cannot tell the position a man would have to be in to fire the balls making the marks ; balls came from three different directions. The stove, as shown in the diagram, would not be between the two shots; it would be to the right.

Cross-examined : Examined the pistol taken from the body of Lockman, and found all the barrels loaded. The marks of the balls in the wall might have been made by the struggling between the deceased and the person shooting, diverting the direction of the pistol, supposing the shooting party to be in or near the door. The pistol shown witness is very similar to the one taken from Lockman; but there were no particular marks by which he could identify it.

By an *addendum* to the statement of facts, it also appears as follows :

The witness, Maggie Mitchell, further stated, that when Major Lockman threw up his hands at the time the prisoner collared him and placed his pistol against him, he, Lockman, had nothing in his hands, but they were thrown open. Major Lockman entered the house humming a song, and seemed in excellent spirits up to the time of the killing. .

The witness, Bartlett, further stated, that Lockman was in excellent humor and spirits on the night of the killing and previous to it; and showed no indications of apprehending trouble or difficulty.

Rush Hutchins said that after Lockman and accused separated at the close of the verbal altercation at Lockman's saloon, and between that time and the meeting at the house of Maggie Mitchell, accused had said to him, witness, that unless Lockman retracted what he had said, he, accused, would shoot him.

It was also proved that the deceased was killed in Galveston county, and that the circumstances attending his death all occurred in said county.

The charge of the court to the jury was as follows :.

XXXII—39.

"Every person with a sound mind and discretion, who shall unlawfully kill any reasonable creature in being within this State, with malice aforethought, either express or implied, is guilty of murder. Murder committed under the promptings of express malice is of the first degree. Murder done under the influence of implied malice is of the second degree.

"Express malice, a malice in fact, the actual evidence of which is a question of fact for the jury to determine, consists of an actual and deliberate intention unlawfully to take the life of another, or do him some bodily harm—a formed design, not merely to take away life, but including an intent to do any unlawful act which may probably end in destroying life. If, therefore, there be premeditated malice, that is to say, a purpose previously considered, meditated and of deliberate intent, to kill, or such a state of mind in the slayer, at the time of killing, as to show that he was sufficiently cool and self-possessed as to be able to consider and contemplate the nature of the act then about to be done, then it is murder in the first degree.

"Implied or constructive malice, which it is not a fact for the jury to determine, is yet an influence or conclusion founded upon particular facts and circumstances determined by them. It may be defined as a killing perpetrated in the commission of some unlawful and malicious act, not accompanied with a deliberate intent or specific purpose to take life. If the act resulting in death is malicious, the perpetrator is responsible for the effects of such willful and malicious act, although he did not intend to kill; but in such case he is only guilty of murder in the second degree.

"Provocation, if offered, even at the time of the killing, consisting of insulting words, however gross and insulting they may be in character, and however great the rage and provocation which they induce, do not constitute a sufficient cause under the law to reduce the offense to manslaughter. Even if the act done were from a transport of passion, it were not such an adequate cause as the law allows, and arising at the time, it is still murder.

" Nor can, in any case, mere threats to take life, unaccompanied by acts demonstrating the intent at the time of his being slain—such demonstrative acts as the accused might reasonably infer from the execution of the deceased's purpose to take his life, or do him serious bodily harm. More especially is this so, if the threats were made at some previous time, and no such demonstration ever been made.

" All persons are principals, who are guilty of acting together in the commission of an offense; whenever others are present when the unlawful act is done, knowing the unlawful intent, and aid by acts, words or otherwise, those engaged therein, although they may not be themselves the direct and immediate persons who consummated the act, they are still held accountable for the consequence of the act done, and are liable to all the penalties that the law inflicts upon the offender.

" Every person is supposed to be innocent until their guilt is established; the question for the jury to decide is, does the evidence show such a state of facts as to prove the accused guilty of the offense charged.

" The intention to commit an offense is presumed whenever the means used are such as would ordinarily result in the commission of the forbidden act.

" The important questions for the jury to decide are :

" 1. Was the deceased killed by the prisoner at the bar, or by those with whom he was associated with in the act?

" 2. Do the external facts and circumstances before and after the time of killing, and having connection therewith, furnish satisfactory evidence of a sedate, deliberate intent on the part of the accused, and at the time of the killing, a formed design to take the life of the person slain, or to do him serious bodily harm, and which in its necessary or probable consequences result in death?

" 3. Or was there such a reckless design (disregard?) of human life, yet without any specific intent to take life, as evidenced a wanton, malicious spirit on the part of the accused, regardless of the social obligations of humanity?

"The prisoner is entitled to the benefit of a doubt; the doubt, however, to be effective in his behalf, must arise exclusively from the facts in evidence and the circumstances surrounding and connected with the act done.

"If, therefore, the jury are convinced, from the facts in evidence, that the prisoner at the bar, Leroy Cotton, did threaten to make Major Lockman retract certain offensive remarks, and, in pursuance of that purpose, did go armed to the house of Maggie Mitchell, and did there carry out that, his design, or either himself shoot, or while associated with others in the shooting of Major Lockman, and that it was done without any immediate and adequate provocation on the part of Major Lockman ; or, in other words, that he did kill, or was engaged in killing Major Lockman, and with express malice, they will bring in their verdict of simply 'guilty,' and the law affixes the penalty.

"If otherwise they are convinced that the act was done without any specific intention to take life, or to do any serious bodily harm to the deceased, yet with a wanton and utter disregard of human life, that he was engaged in the act of killing Major Lockman, then they will bring in their verdict of guilty of murder in the second degree, and assess the punishment at not less than five years' confinement in the penitentiary, up to confinement for life, according to the degree of criminality attached to the accused, and as proven by the evidence. But, if otherwise, they will say not guilty."

No instructions appear to have been asked either by the prosecution or the defense.

On the 3d of April, 1869, the jury returned a verdict of "guilty of murder in the first degree."

The accused moved for a new trial on the same grounds as those assigned for error, which are recapitulated in the opinion of the court. The motion was overruled, and the accused gave notice of appeal.

On a subsequent day of the term sentence of death was passed upon the accused, with stay of execution until the determination by this court of his appeal.

*Henderson & Whitfield,* for the appellant, cited the eleventh amendment to the Constitution of the United States, and Art. 1, sec. 8 of the State Constitution, touching the right of accused persons to trial by an impartial jury; and also, in the same connection, Art. 2994, Paschal's Digest, providing for change of venue. They then proceeded as follows:

It will be seen that the constitutional right to an impartial trial, without any legislative enactment to secure it, when causes existed, would be a naked right without a remedy. So the Code prescribes the mode and manner, thus giving the defendant a remedy whenever it becomes necessary to invoke it. This defendant did ask for the right guaranteed to him, and alleged that both causes existed, but it was refused him.

The Code furnishes the statutory proof required to remove a cause when either prejudice exists, or where there is a dangerous combination against the accused, to wit: "The affidavit of the defendant, supported by the affidavit of two credible persons, residents of the county where the prosecution is commenced. The truth and sufficiency of which the court shall determine."

Now we appeal with confidence to the judgment of this court to determine whether or not the defendant complied with the requirements of the statute in making an affidavit himself, supported by two credible persons, and stating both causes in the very language of the statute.

It will be seen that whilst the Code prescribes what shall be done by the defendant, it is entirely silent as to how and in what manner the court shall determine the truth and sufficiency of the application.

That the law never contemplated that a judge or court should have any discretion when the statute was fully complied with, is most manifest. If otherwise, the Legislature would have prescribed the manner and mode by which the truth and sufficiency of the application should be determined, instead of leaving it silent. How is the truth to be determined? By a jury? By an issue before the court? By *ex parte* affidavits? By

going through the community and ascertaining the existence or not of the facts sworn to as the law prescribes? Then by what manner is the judge to determine the truth and sufficiency of the application for a change of venue?

We feel confident that the only mode known to the law to determine the truth and sufficiency of the application, is by the motion itself. Does the motion comply with the requirements of the statute, as prescribed in Art. 2994, Pas. Dig.? (Cook v. Garzia, 9 Tex., 358.) The motion shows for itself, and also shows that it was sworn to by the defendant, supported by two credible persons, residents of Galveston county. It was not pretended or intimated that the two persons were not credible. The defendant has in every respect based his motion on, and complied with all the requirements of the statute.

This court, from its earliest adjudications, has held on similar statutes, such as those regulating continuances, attachments, and sequestrations, that the allegations in the affidavits were not traversable. And why not? Because the statute under which those writs are issued provides no means by which the court can determine their truth on a motion. Hence, when parties have complied with the strict letter of the statute, the court has no discretion. (Hipp v. Bissell, 3 Tex., 18; Prewett v. Everett, 10 Tex., 283; Hyde v. The State, 16 Tex., 453.)

There has been no adjudication by this court upon the provision of the statute now under consideration. But this court has, in the case of Salinas v. Stillman, 25 Texas, given a construction to the laws in existence before the enactment of the Code. It provides that the court shall have power to change the venue, on good and sufficient causes set forth and duly supported by the oath or affirmation of three disinterested citizens of the Republic (now State.) "The sufficiency of which evidence shall be determined by the presiding judge." Now, it will be seen by this court, that in the old law the causes are not prescribed as they are in the Code. But the sufficiency of which evidence the presiding judge shall determine, not by the law itself, but from the fact stated and which were not statutory as

in the Code. By the former law, we find that the presiding judge had a discretion, full and ample; and yet Justice Wheeler says in this connection : " The court is to decide upon the legal sufficiency of the cause or causes set forth, and the credibility of the witnesses required to be produced in support of the application. It is upon the sufficiency of this evidence the court is to determine." The difference between the law then in force and the present statute is that the application at that time was required to be supported by three disinterested citizens, and now by two credible persons, residents of the county. The presiding judge shall determine the sufficiency of the evidence by the old law. By the present statute, the court shall determine the truth and sufficiency.

We call the attention of the court to the case of Salinas v. Stillman, 25 Tex., 13. It will be seen there that an application was made to remove a case, then pending in Cameron county, out of the 12th judicial district. Counter affidavits were offered. The presiding judge held that as to the causes alleged in the motion, so far as they related to Cameron county, where the suit was pending, they could not be traversed by counter affidavits.

Justice Wheeler, in that case, gives the reasons with so much force, that we adopt them as a part of our argument upon the point now urged before this court. From the cases cited we contend that the court below erred in not granting a change of venue, and in not granting a new trial.

The sixth error assigned grows out of the motion for a change of venue, and we propose to show that it was not sanctioned by law or the practice in Texas in a single case in the judicial history of this country, embracing a period of time from A. D. 1836, to A. D. 1869. The error complained of is that the court, of his own motion, called Col. Cram, of the United States army, then stationed and in command of the post of Galveston, and Frank Dirks, the sheriff of said county, to the stand as witnesses against the motion for a change of venue.

These witnesses only swear to their belief that the prisoner

could get a fair and impartial trial in Galveston county. The most inveterately prejudiced man in the county could have sworn to the same thing. (See Salinas v. Stillman, 25 Texas, 13, as to what Justice Wheeler says on this point.) Did they swear that there was no prejudice of such a character as to prevent the defendant from getting a fair trial? Did they swear that there did not exist a dangerous combination, instigated by influential persons, that would prevent the prisoner from getting a fair trial? That there was no mob raised to take him out of jail, or that the newspapers did not make full and severe strictures against the prisoner?

Nothing of the kind; but they simply *believed* the defendant could get a fair trial in Galveston county. The facts set out in the motion were positively sworn to by the parties required by the statute, and those facts were not traversed by either the military commander or the sheriff, nor was the credibility of the witnesses in support of the motion attempted to be questioned or impeached. We urge that this is a new and novel proceeding in the practice of the District Court, unsanctioned by law or by precedent, and expressly condemned by the highest judicial tribunal in this State—the court over which your honors preside—in the case above cited, and for this error the court should have granted a new trial.

Suppose your honors should hold that the court below has the right to call witnesses, or to hear, as in this case, the *belief* of prejudiced witnesses, most certainly the defendant would have the right to support his application by additional testimony—which was denied him. What number of witnesses does it require by statute to remove a cause by change of venue? Two credible persons, residents of the county where the prosecution is commenced, together with the affidavit of the accused. Now, is this the statutory proof required? Certainly not, if the court, being the judge of the truth and sufficiency of the causes assigned, determines for himself, and upon whatever kind of testimony he chooses, regardless of the Code. Who is to control him? Certainly not the law as put forth in

the Code. Who is to be the keeper of his conscience, or what kind of evidence will satisfy his mind? Are two or three witnesses, as to what they *believe*, sufficient? It seems to have been enough in this case.

If the court is to be the judge of the truth and sufficiency of the causes assigned, and to determine it, as it was in this case, by the mere belief of two persons, then we say that the great right, secured by the Federal constitution and by the constitution of the State, of a fair and impartial trial to a citizen accused of crime can never be had in this State, if prejudice or a combination exists in the county where the prosecution is commenced. There can always be found, one, two, or a half a dozen of witnesses who would swear that they *believed* that the accused could get a fair trial, and the greater the prejudice existing, the greater would be the facility of procuring such testimony against the accused. (Salinas v. Stillman, 25 Texas, 13.)

The record shows that the twelve jurors were tried, elected and duly sworn " well and truly to try the issue between the State of Texas and the defendant, and a true verdict render according to the law and the evidence." The Legislature of the State of Texas, on adopting the Code of Criminal Procedure, prescribed the following oath to be administered to a juror in a criminal case: " You solemnly swear that in the case of the State of Texas against (A. B.) the defendant, you will a true verdict render according to the law and evidence, so help you God."

When the Legislature has prescribed the form of the oath to be administered to the jury in capital cases, and the record in such a case shows affirmatively that the statutory requirement has been disregarded, it is a fatal objection to the legality and regularity of the judgment. (See Arthur v. The State, 3 Texas, 403.)

Any other oath than that prescribed is, in contemplation of law, no oath; and it is clear that the finding of a jury, not under oath, can not constitute a legal verdict upon which the

court can proceed to give judgment. (Nels v. The State, 2 Tex., 283; Arthur v. The State, 3 Tex., 405; 1 Miss., 497; 1 Chitty's Crim. Law, 661 to 664.)

As the statutes of jeofails and amendments do not apply to criminal proceedings, it follows that every error which would have been fatal in arrest of judgment, will be sufficient now to procure its reversal. A material objection also to the record of the judgment will be fatal. (1 Chitty's Crim. Law, 752 to 754.)

Counsel further proceeded to discuss the charge of the court, and the ruling upon the competency of the juror.

No brief for the State has reached the hands of the Reporter.

LINDSAY, J.—The indictment in this case was returned by the grand jury in the Criminal Court for Galveston county, at its March term (A. D. 1869). It was founded upon an accusation against the appellant for the murder of John B. Lockman, on the eleventh day of January, in the year of our Lord eighteen hundred and sixty-nine, in the county of Galveston and State of Texas. Upon the trial in the Criminal Court, the accused was found guilty of murder in the first degree. A motion was made by the convict for a new trial, which was overruled by the court. From this ruling of the court, and the final judgment rendered, this appeal has been taken, and the cause is now before this court for revision upon the assignment of errors found in the transcript of the record.

The errors assigned in the record are nine in number, and are substantially and briefly: 1. The refusal of the court to change the venue. 2. Refusal to grant a continuance. 3. The overruling the motion for a new trial. 4. In the charge to the jury. 5. That the jury was mislead by the charge. 6. In receiving other testimony than the affidavits of the applicant and of two credible persons on the application for a change of venue. 7. The overruling the objection to the introduction of other witnesses on the consideration of the application. 8. The

refusal to allow the applicant to call witness for witness, in determining the justness of the application.    And 9. In compelling the accused to challenge peremptorily a witness, whom he deemed incompetent for cause.    These are the various reasons which are relied upon for a reversal of the judgment, and for awarding the convict a new trial.

It is, and ought to be, a principle in the administration of justice in a criminal cause, where the life of a rational and immortal being is the issue in the investigation, that all the technicalities of the law may be used, and made available if possible, in its protection and defense, as far as is allowable by positive law.    It is a humane principle, not inconsistent with the Criminal Code of the State, and flows from the same fountain in which our criminal law itself has its origin—the common law.

As, by the law, and under its forms, guilt is to be punished; so, by the law, and under its forms, innocence is the more certainly shielded and protected.    The strict observance of the rules of law, in all their details, is a high manifestation of civilization.    Their disregard always points out a people still in the eclipse of barbarism.    Hence, it is necessary to give all due consideration to even the technicalities of the law whenever the life of a fellow-mortal is suspended upon the issues between truth and falsehood, to be determined by judicial inquiry, in mere human tribunals.    The full benefit of every technical objection, therefore, which is allowed by positive law, should be extended to the prisoner in the revisory action of this final tribunal to enable him to make manifest, if it be possible, by a re-investigation of his case, his innocence of the crime with which he stands indicted.    This is a part of the humanity of the law, which, it is hoped, will never be disregarded by this court, unless imperiously controlled by an inflexible mandate of the written law.    It is what is meant by law, administered in mercy.    It is not to neglect and disregard the technical requirements of law in administration, but to insist upon a rigid observance of its rules in enforcing its sanctions.    And as the

State exacts strict obedience to its penal laws, so ought the State, in the prosecution of those who infract them, strictly to observe the rules which she has prescribed to ascertain and punish the guilty violators of her laws. This is but a canon of impartial justice, which States, as well as individuals, must recognize, and ought always to act upon.

Among the nine errors assigned as having been committed by the court in the progress of the trial, there are only three, the first, second and fourth, (the denial of the change of venue, the refusal to grant a continuance, and the alleged error in the charge of the court,) which it will be necessary for this court to settle in this adjudication, as all the rest are incidentally involved in their determination.

1. Did the court err in denying the change of venue, as a matter of *right* to the accused, upon his [application, for the alleged causes set forth in the statute? (See Paschal's Digest, Art. 2994.) The proper solution of this question is dependent upon the true construction of that article, (2994,) which this court is now called upon, for the first time, to give. A similar provision to the one under consideration was passed by the Congress of the Republic, on the 14th of January, 1841, providing for a change of venue, in both civil and criminal causes, and which was acted upon by the courts, till it was supplanted by legislation on the subject, under the constitution of 1845, in the third section of the schedule of which provision was made for its abrogation by its actual repeal or alteration by the Legislature. By the authority given in the constitution of 1845, the Legislature had enacted, that " the District Courts may order a change of venue for the trial of any suit, civil or criminal, under the rules and regulations prescribed by law." But the Legislature, not having established any rule or regulation, except in the case of the disqualification of the judge presiding, it seems that the District Courts continued to act under the law of the Republic, in civil cases at least, up to the passage of the act under review. That act varied from the present, in requiring three disinterested witnesses to the sup-

porting oath of the application.  It left the determination of
the sufficiency of the evidence to the presiding judge.  In
adjudicating upon that act, in the case of Salinas v. Still-
man, 25 Texas, judicial discretion in that case being the real
issue of law presented, this court affirmed the exercise of judi-
cial discretion, and did not attempt to control it.  It was the
only real question at issue in the case.  All action in changes
of venue, both civil and criminal, were taken by the courts
under the law of the Republic, until the adoption of the Crimi-
nal Code, on the 1st of February, 1857, in which is the Art.
2994, Paschal's Dig., and reads as follows : "A change of venue
may be granted on the written application of the defendant,
supported by his own affidavit, and the affidavit of at least two
credible persons, residents of the county where the prosecution
is instituted, for either of the following causes : 1.  That there
exists, in the county where the prosecution is commenced, so
great a prejudice against him that he can not obtain a fair and
impartial trial.  2.  That there is a dangerous combination
against him, instigated by influential persons, by reason of
which he can not expect a fair trial."  This provision of law
was not compulsively enacted.  The constitution of 1845, in
Art. 7, sec. 14, authorized the Legislature to provide for a
change of venue in criminal as well as civil cases.

And although the language of the constitution is mandatory,
saying that the Legislature "shall provide for a change of
venue," it is at last only permissive and admonitory.  For, by
what sanctions can the duty be enforced?  It is left to the will
of the Legislature, who are chosen by the people; and if the
people, through their representatives, desire no such change,
how can it be claimed as a *right?*  The change of venue is not
a *right* to be claimed by the citizen, but it is a mere incident
of the civil institutions of a country, and is a grant of the
aggregated mass of the population, in its discretion, with what-
ever limitations it may choose to prescribe, in the regulation
of its civil polity, to the individual citizen; and can only be
enjoyed upon the terms upon which the grant is made.  The

term *right* is too often used in a vague and indefinite sense.
It must not be supposed that there is a constitutional right to a
change of venue in the citizen.   The right of trial by jury is a
constitutional right.   But the right to a change of venue is a
mere *legal* right, and can be claimed only upon the terms pre-
scribed in the law, and under all the qualifications which are
rationally deducible from it, by a common-sense interpretation
of the letter and spirit of the law.   In interpreting this law, all
its parts must be made effective.   If it be true that the affidavit
of the defendant, with the supporting affidavit of two resident
credible persons in the county, where the prosecution is insti-
tuted, affirming the cause, or causes set forth in the statute, is
conclusive upon the district judge, what becomes of the judg-
ment of the court upon the *truth* and *sufficiency*—not of the
*application*—but of the causes alleged and relied upon in the
application?   If that judgment is exercised by the court, what
method can be improvised by an appellate court to remedy the
*casus omissus* in the law, in not providing the means of testing
the correctness or incorrectness of the judicial opinion of the
court below?   This court would be greatly at fault to discover
any method of satisfying its own mind of the truth and suffi-
ciency of the cause or causes which might be set out in the
application, unless it could be placed in the precise condition
of the district judge.

By the act of the 22d June, 1846, and the then existing law
of the Republic, it was left entirely to the discretion of the
District Courts to determine both the causes and the methods
of the change.   It was a discretion which this court has no
right to undertake to control.

In Art. 2994 the grounds or causes which may be assigned
for a change of venue, are defined in the statute.   If they exist
the party is entitled by law to a change.   The great prejudice
of the community, or a combination of influential persons,
against the accused, are legal and sufficient causes for the
change.   The allegation of both or either of these causes by
the affidavit of the party, supported by the affidavit of two

credible persons in the county, warrants the accused in submitting his application to the consideration of the court. But this mere submission of it does not conclude the application and entitle the party to the change, simply because he has complied with the statute in the assignment of the causes and in the method of its presentation. When all this is done, something more is necessary. The court is required to judge of the *truth* and *sufficiency* of the causes. How this judgment is to be exercised, the law does not point out. Hence, the judge is not circumscribed by a *legal* discretion. Over a legal discretion this court would be entitled to exercise a supervision. If it were the mere *application* about which the judge was required to exercise his discretion, and the application was made in strict conformity with the statute, yet, should the judge absolutely refuse to hear and consider it, he would then be guilty of an abuse of his legal discretion, and this court would be authorized to correct such an abuse of it. By this statute, the district judge is made the sole and irresponsible arbiter of the sufficiency or insufficiency, the truth or falsehood, of the alleged causes for a change of venue. The law, too, prescribes no methods by which he shall enlighten his understanding about the truth or falsehood of the causes assigned. An investigation may or may not be necessary to satisfy his mind of the credibility of the supporting affiants. If he personally knows them to be unworthy of credit upon oath, he needs no further evidence of the insufficiency of the cause or causes. If he has actual personal knowledge of the temper and tone of the people of the county towards the accused, other proof is needless of the falsehood of the affidavit. He might refuse to grant the application, however regularly made, and however strictly in conformity with the requirements of the statute, without any proof whatever. And how could this court ascertain by any law, that he had judged wrongly? Yet, the law says he must judge of the truth and sufficiency of the causes. If, however, he is in doubt about the truth and sufficiency of the causes, upon the presentation of the applica-

tion, he may resort to whatever methods of enlightenment he may deem most expedient to enable him, honestly and faith- fully, to discharge his duty to the State and to the accused, and to secure a fair and impartial trial to the prisoner, untram- meled by any positive law, and solely under the guidance of his own personal discretion. This law does not undertake to hedge in the discretion of the judge by any legal and technical rules, but leaves him, from the necessity of the case, to his own uncontrolled judgment, and amenable only to public opinion for any wanton or tyrannical abuse of it. It is, like many other acts of judicial administration, left necessarily to the sole dis- cretion of the judge, and can not be reviewed and corrected by this court. Taking the words of the act in their plain and obvious meaning, as the Criminal Code enjoins, the court is, satisfied this is the true and correct interpretation of this pro- vision of the law.

The question of continuance, also, involves matter of discre- tion in the court. But this is a discretion which is fixed and circumscribed by well defined rules. In this case it is a legal discretion. When those rules are transcended, or violated, there is something which may be made tangible and appre- ciable to the understanding; and this court is endowed with authority to modify, or correct, the resultant wrong or injury. If there was error in refusing to grant a continuance, the party, by failing to take a bill of exceptions, has not placed himself in a position to avail himself, in law, of the advantage of such an error. It is needless to quote the decisions of this court in support of this rule. The current is uniform in civil causes; and when a party does not except to the rulings of the court, if there be error, it is considered as waived. So, by the Crim- inal Code, a party may waive all errors, except a trial by jury. If, however, in a criminal case, and especially in a capital fel- ony, enough should appear in the record to evince a case of doubtful guilt, this rule ought not, by any means, to be held inflexible, at the peril of innocence.

It is urged by the very able and ingenious counsel for the

prisoner, that the charge of the court was calculated to mislead, and did mislead the jury; because a clear and satisfactory distinction was not drawn in the charge between murder in the first degree and murder in the second degree. This is one of those difficult tasks which this court, as yet, has never performed to its own satisfaction. It certainly is a labor of no small difficulty.

There are three grades of felonious homicide defined by the Criminal Code: murder in the first degree, murder in the second degree, and manslaughter. Each of these offenses has a separate and different penalty annexed to it. Every felonious homicide that is committed, is either manslaughter or murder; but whether murder of the first or of the second degree is the difficult and embarrassing question in the practical administration of the criminal law. If the homicide is committed with express malice, it is murder in the first degree. If with merely implied malice, it is murder in the second degree. The distinction between manslaughter and murder, whether of the one degree or of the other, is obvious enough. But the precise line of demarkation between murder of the first and murder of the second degree, as developed by acts, manifested in the evidence, seems in many cases to elude the sagacity and penetration of most jurists as well as lawyers. Under our system, the difficulty of detection, in some of the various phases of criminal homicide, stands confessed. In all cases of murder, malice is a necessary ingredient. Malice is but a wicked and evil state, or frame of mind, towards another; a mental emotion, aroused and awakened by some motive of real or imagined wrong; or of some personal benefit, or advantage to be gained, fostered and cherished in moments of coolness, sedateness and deliberation, and which prompts to action, and seeks its gratification in the destruction of its intended victim, whenever a favorable conjuncture of circumstances may present itself. It is likewise to be implied in all cases of homicide, and its existence is always presumed, till the facts, developed by evidence, show that the act of killing was in *sudden* passion, from an

XXXII—40.

adequate cause—which makes it the offense of manslaughter; or, if the proof evinces unmistakably that there was no express malice actuating the conduct of the slayer, but that he, nevertheless, slew his victim without an adequate cause, it can not graduate the offense to manslaughter, but must leave it intermediate between manslaughter and murder in the first degree. The slaying under such circumstances, without express malice, being without adequate cause, will constitute an offense denominated in the Code murder in the second degree, which is one of the cases of murder upon implied malice, though no malice be actually detected by the proof upon the trial. Such a state of case constitutes murder in the second degree, while there are various other states of fact, which come within the same category. It is needless to advert to the various possible phases of this offense, as the purpose is to settle the principle which is involved in this case. Testing, therefore, the charge of the court by the principle enunciated in the view here taken, the court can discover no such error in the charge as could operate on the minds of the jury to the prejudice of the prisoner.

The other errors assigned are all embraced by the principles relied upon and the reasoning used, in disposing of those discussed, except the ruling of the court as to the competency of a juror, which the accused was compelled to challenge peremptorily, and also the exception to the oath. The court can not regard the objection to the ruling of the court upon the competency of the juror, as a valid one, unless the accused had been thereby compelled to accept an objectionable juror, after the exhaustion of his right of challenge. Nor does the court require the force of the obligation in regard to the oath. In the minutes of the court, it appears in the recital of the historical progress of the investigation, that the jury was duly sworn, and in making that recital the record simply states the object and purpose of their being sworn, which was the real object and purpose, as stated, for which they were sworn, and was not intended to set out the oath *in hæc verba.* Nor was it neces-

sary to set forth the oath in the record of the trial. The *purpose* of swearing them was correctly recited: " well and truly to try the issue between the State of Texas and the defendant, and a true verdict to render in accordance with the law and the evidence." It is presumed the truth was recited in the record.

By the aid of the lights afforded by the arguments of the attorney general and the learned counsel of the prisoner, which were conducted with unusual and signal ability on both sides, the court, duly impressed with the solemn responsibility of its position, in having even an official agency in settling, in any degree, the worldly destiny of a fellow mortal, feels some assurance of confidence, however, that in the settlement of the points raised in the record, correct conclusions have been arrived at. Under a conscientious conviction of the truth and correctness of the principles of law relied upon, and of a sense of obligation to society and to good government, the court is constrained to withhold the new trial sought by this appeal.

The judgment of the Criminal Court of Galveston county is therefore affirmed, and remanded for the sentence of the law to be pronounced and executed.

Affirmed.

LINDSAY, J.—In full consultation this application has been carefully considered. From the gravity and the solemnity of the interests involved, it was not hastily, and without due reflection, disposed of. The zealous argument of counsel, and the urgent appeal to the court to reconsider the law applicable to the facts of the case, have prompted a calm and deliberate re-examination of the grounds upon which the decision of the court was based; and after the most dispassionate scrutiny of the law and the facts of the case, and of the conclusions arrived at in the opinion already delivered, no such error is found as would warrant the court in granting the rehearing which is asked. It is therefore refused.

Rehearing refused.