## W. F. HOLLAND v. THE STATE OF TEXAS.

1. A second application for continuance by a defendant in a criminal cause on account of the absence of a witness residing in the county, who had attended in obedience to a subpœna at the former term, but for whom no attachment had been issued or applied for during the three days which had elapsed of the term at which the application is made, does not show due diligence.

2. On a second application for continuance by the accused, when the absence of the witness is stated in the affidavit to be on account of sickness, the character or effect of the disease should be stated in the affidavit, or set forth in an affidavit of the physician, or some other person.

3. It is proper for the court, in considering a motion for new trial based on alleged error in overruling an application for continuance, to consider the facts established on the trial, both with a view of determining the materiality of the facts which it was stated the absent witness would prove, and the truth of the affidavit.

4. The statement in an affidavit for continuance on account of the absence of a witness that the absent witness would "contradict and expose the witness A. B.," without stating how, is too vague and indefinite.

5. See this case for circumstantial evidence held sufficient to authorize a conviction for murder.

6. On a trial for murder a general verdict of "guilty," which does not find in terms the degree of murder, but assesses the punishment at hard labor in the penitentiary for life, is sufficient to support the judgment.

APPEAL from Erath. Tried below before the Hon. J. P. Osterhout.

Indictment of Frank Holland for the murder of John Hayes.

The conviction of the prisoner of murder in the first degree was obtained on circumstantial evidence alone.

In 1861 John Hayes married Mary, the daughter of Dr.

Wm. Edwards, of Erath county.   A few weeks after the
marriage Dr. Edwards received information that Hayes
had a living wife in another State, and instituted prose-
cution.   In default of bail, Hayes was committed to jail,
escaped, and was not heard from for about eleven years.
In 1872 he returned to Erath county.

On his return he found his wife had married again, with
Frank Holland, and she and a son, the offspring of the
first marriage, were living with Holland.   Some negotia-
tions took place, in which Hayes left it to the choice of
the lady to return to him or remain with Holland.   She
chose the latter, and the affair was finally settled by an
agreement that she should remain with Holland and
Hayes should have his son.

In September, 1872, at the solicitation of Dr. Edwards,
Hayes consented that his son, Jack, should go with his
grandfather to visit his mother, with the understanding
that the boy should return to him on the Sunday evening
following.

At that time a camp-meeting was in progress under the
direction of Dr. Edwards and near his house, and Sunday
afternoon Hayes, Holland, his wife, the boy, Dr. Edwards,
Joseph S. Edwards (a brother of Mrs. Holland), and
others were there.   Late in the afternoon Hayes proposed
to leave, and wished to take his boy with him, which was
objected to by Holland and J. S. Edwards, and "a fuss
in words" ensued between the parties, which ended in an
acquiescence on the part of Hayes to the boy remaining
a few days longer, and he left, angry and declaring he
would have his boy.   He left the camp ground at from
one and a half to two hours before sunset, and in fifteen
to thirty minutes after Holland and J. S. Edwards left the
camp, all going in the same direction—Hayes to his home
at Waller's, and Holland and Edwards, with two others,
ostensibly to the house of Edwards to attend to the cows

and calves; Holland riding a small unshod mare, Edwards a large chestnut-sorrel horse, shod before and unshod behind; Edwards wearing a black coat, Holland a brown. Of their companions, one (Henson) was mounted and the other (Vic. Edwards) on foot. After going some distance a separation occurred, Henson giving up his horse to Vic. Edwards and walking a nearer path. When he came into the road again he fell in with Vic. Edwards alone, who, in answer to his inquiry, told him that Holland and Edwards would be along after a while.

Holland and Edwards were next seen (one witness, who says he saw them at Jo. Edwards', being contradicted by Susan Edwards) about dusk, returning to the camp ground, their horses appearing tired, as if they had been going at speed. They were much excited, ate no supper, and used singular and suspicious language.

At about an hour by sun (as he states) a young man named Harper, at work in his father's field, a quarter or half mile from the spot where Hayes was found dead, heard the voice of a man exclaiming, "Oh! oh!" and immediately after a shot; saw a horse running, saddled, without a rider, and immediately after heard another shot; then saw on horseback a man in dark clothes, through an open spot in the timber towards the creek, and soon after two men on horseback, on the other side of the creek, going into the timber. He told his father what had occurred, and they went together to the spot where he heard the last shot, and there found Hayes dead.

When defendants returned to the camp Dr. Edwards went to them and they conversed awhile together privately.

During the following night information was received by J. B. Waller, with whom Hayes resided (and whose house was beyond Edwards' from the camp ground), that Hayes had been found dead near the road to the camp ground. Early the next morning he went to the place, and found

him four miles from the camp ground, shot through the head, as had been reported to him. With a view of ascertaining as much as possible in regard to the homicide, he examined for horse tracks. He found a number of tracks going towards the camp ground, and three, apparently recent, coming from it. He found one the track of a pony of his own, which he had lent to Hayes. Her track was familiar to him, and he followed it back. He discovered that (as indicated by the tracks) the pony had been running for a short distance along the road, and from where she quit the road to where deceased was found, but beyond that, towards the camp ground, the gait appeared to have been leisurely. Accompanying the track of the pony were, on either side, the tracks of a horse—one a large horse, with two shod and two unshod feet, and the other a smaller barefooted animal; and their tracks showed clearly the gait of these two, as far as he traced them, to have been a gallop. He followed these tracks backward, in the direction of the camp ground, to within half or three-quarters of a mile of that spot, and no further.

Complaint having been made, Holland and Jo. Edwards were arrested the next day by warrant of a justice; and on being arrested they surrendered each a pistol, one of which had one empty barrel ; in the other, one barrel, which had been recently discharged, was newly reloaded.

The prisoner's second application for continuance was overruled; its character may be ascertained from the opinion.

On the same day the prisoner applied for a change of venue on account of prejudice, in the terms of the statute, supported by the affidavits of five citizens of the county. Counter-affidavits were filed by seven citizens, all of whom stated that one of the five who had made affidavit for the prisoner was not a respectable citizen of the county.

The motion for change of venue was overruled.

The following verdict was returned on the trial : ''We, the jury, find the defendant guilty, and assess his punishment at hard labor in the penitentiary for life.''

*Wm. H. Lessing,* for appellant.

*Brown,* for the State.

OGDEN, P. J.—It is claimed for the appellant in this case that the court below erred in overruling his motion for a continuance, and for which error the judgment should be reversed.

When a motion for a continuance on the first or second application fully complies with the law, and sets forth a meritorious ground, the party making the same is entitled, as a matter of law, to have his motion prevail. In a criminal case, where the application is made for the want of a witness, there are two requisites which the application must contain, and which calls forth the exercise of judicial discretion, viz., the diligence which has been used to procure the attendance of the witness, and the materiality of the testimony sought. Upon these prescribed requisites the court should exercise a sound legal discretion, and grant or refuse a continuance, according as the facts stated and the law require. Upon a second or any subsequent application it becomes the duty of the court to examine critically every fact relied upon, and to regard with disfavor every manifest attempt at imposition or delay.

The application for a continuance in this case was based upon the want of the testimony of Susan Edwards and M. J. Edwards ; but Susan Edwards subsequently appeared and testified for defendant on the trial, so that the action of this court must depend upon the ruling of the court below, in regard to the absent witness, M. J. Ed-

wards ; and the first inquiry is, does the affidavit show due diligence to procure the attendance of said witness ? She was duly subpœnaed in November, 1872, and was in attendance on the court at its February term, but failed to appear at the May term. She is a resident of Erath county, and, under ordinary circumstances, her presence could have been enforced in a few hours. Her failure to appear on the first day of the term entitled the party to an attachment; and yet three days were allowed to pass without any effort to procure her attendance. This fact itself, we think, shows a sufficient want of diligence to authorize the court to exercise its judicial discretion; and in view of all the surrounding circumstances to grant or refuse the application, as justice might appear to require.

But the affidavit states that M. J. Edwards is sick and unable to attend court. We think this statement of the defendant below alone would rather tend to cast suspicion upon the application. It shows very recent communication with the witness, as he swears to her present physical condition, but fails to state the character of the disease, or whether he was capable of judging in regard to the character or extent of any disease. Had his application been accompanied with an affidavit of the witness' physician, or other person capable of judging of the character or effect of diseases, or from herself, that would have relieved the statement from the suspicion which now envelopes it, and doubtless caused the court to disregard it.

The facts which the appellant proposed to prove by the witness, M. J. Edwards, when the application for a continuance was first presented, might have been considered sufficient to entitle the affiant to a grant of his motion ; but the subsequent trial demonstrated to a great extent their immateriality ; and the court below, in considering the motion for a new trial, should have considered them

in the light of all the facts adduced upon that trial. And this court, in determining the merits of this appeal, may be authorized in comparing the affidavit with a proven history of the case.

It is stated in the affidavit for a continuance that the facts proposed to be proven by M. J. Edwards, cannot be obtained from any other source; whereas, nearly all the material facts sought to be proven by her were proven on the trial by one or more witnesses. The distance from the camp ground to where Hayes was killed, the time which elapsed between the leaving of the camp ground of Hayes and appellant, how long he was absent and when he returned, and whether he was armed or not, were facts testified to by several witnesses; and the statement of the opinion of M. J. Edwards could have made no material difference in the question of guilt or innocence.

The statement that M. J. Edwards would contradict and expose the witness, Henry Henson, without stating how, when or where, is too vague and indefinite to require further notice. In view of these facts, we think the court did not err in overruling the motion for a continuance, and the motion for a new trial upon the same grounds. We think the court did not err in the exercise of its legal discretion in refusing a change of venue. In the case of Cotton v. The State, 32 Texas, 614, that question was so ably and thoroughly considered that we deem it necessary only to refer to that case for the settlement of the question raised in this.

The appellant, in connection with another, was charged with the deliberate and premeditated murder of Hayes, and the whole proof tends to establish that crime, if it establishes anything. The only defense set up by appellant was an *alibi;* he thereby tacitly admitted that if guilty at all, he is guilty of murder in the first degree; and in view of the charge alleged in the indictment, and

the proof upon the trial, the court instructed the jury that, "If the jury believe from the evidence that the defendant and J. Edwards, acting together, coolly, deliberately and with a sedate mind and formed design to kill Hayes, followed him and shot him with a pistol, from which pistol shot Hayes died, then you will find the defendant guilty of murder in the first degree." In this very brief but comprehensive charge the court gave the jury to clearly understand all that was necessary for them to know in regard to what is murder in the first degree, and what is express malice, and no other instruction on those points was required, and none other should have been given. The instruction in this case is quite similar in that respect to the one given in Poe and Robinson v. The State, 32 Texas, 65, and which this court very justly commended in the highest terms.

The verdict of the jury, as was said by Justice Roberts in Slaughter v. The State, 24 Texas, 410, is a literal compliance with Article 626, Criminal Procedure—3090, Paschal's Digest. The appellant was charged with murder in the first degree, and the jury found him " guilty," and assessed the punishment prescribed for that offense. There can be no doubt or ambiguity in the verdict, and it is fully sufficient to support the judgment rendered. If, as in Slaughter v. The State, the jury had found the defendant guilty in general terms, and then had assessed the punishment for a lower degree of homicide, their verdict would then have been irregular and ambiguous, and in disregard of Article 3095, Paschal's Digest; but such was not the fact, and we think the verdict sufficient under the statute and decisions.

It is further claimed for the appellant that the verdict and judgment is unsupported by the evidence, and that the judgment should be reversed for that reason. It is true that this case is dependent mainly upon circumstan-

31

tial evidence, which should be criticised with great caution by courts and juries before permitting such evidence to be the foundation of a judgment against a fellow-creature, and especially when the charge is of so grave a character as the one presented in this record. But it is also true that the court and jury before whom a case is originally tried have greatly superior advantages for weighing those circumstances, and the means by which they are established, to an appellate court who must look to an imperfect record for all their information; and therefore the law has made the juries the exclusive judges of the facts in all criminal cases, and the oft-repeated decisions of this court have established the rule in this State, that a judgment in a criminal case will rarely be disturbed by this court upon the facts of a case, where there is any evidence to support the judgment.

As there is another party to be tried for the same offense and upon the same state of facts, we refrain from any comment upon the evidence in this case, further than to say that the appellant has been tried by a jury of his country, under apparent impartial circumstances. The law has been administered by the court with great care and ability. And now, after a careful review of all the facts presented by the record, we are forced to the conclusion that the judgment of the lower court should not be disturbed; it is therefore affirmed.

AFFIRMED.