· [No. 1405.]

## BEN WOOLDRIDGE *v.* THE STATE.

1. CONTINUANCE—PRACTICE.—The rule now is that even an application for a first continuance is addressed to the sound discretion of the trial court, and is not a matter of right.
2. SAME—PRACTICE IN THIS COURT.—In revising the refusal of a continuance asked because of absent witnesses, the evidence adduced upon the trial is considered by this court in order to determine whether the desired testimony was probably true, as well as whether it was material if true; and its materiality must not only be shown, but the probability of its truth must appear, before this court can hold that the court below abused the discretion with which it is invested.
3. SAME—PRACTICE.—See the opinion *in extenso* for circumstances under which a continuance was properly refused because: 1, the application shows a total lack of diligence; 2, because the application shows it to have been within the power of the accused to produce from a present source the proof expected to be made by absent witnesses; and 3, because in view of the evidence adduced the absent testimony did not appear probably true.
4. SAME—CHARGE OF THE COURT.—Where the main fact in issue was supported by direct and positive testimony, and the circumstantial evidence adduced was consistent with and only corroborative of such positive testimony, the court properly refused an instruction upon circumstantial evidence embodying the rule in Webster's case.
5. VERDICT—JUDGMENT.—The well defined English word "fist" can, under no possible circumstances, be held *idem sonans* with the equally well defined English word "first," and hence a verdict in a murder case which reads, "We the jury find the defendant guilty of murder in the 'fist' degree," etc., is insufficient and illegal, and will not support a judgment of conviction. See the opinion *in extenso* on the subject.
6. SAME.—Article 705 of the Code of Criminal Procedure, defining the requisite of verdicts in criminal cases, requires: 1, that the verdict must declare the issues; 2, that the verdict must be in writing; and 3, that it must be concurred in by all the jurymen.
7. SAME.—Article 710 of the Code of Criminal Procedure provides that, "where the jury have agreed upon a verdict, they shall be brought into court by the proper officer, and if, when asked, they answer they have agreed, the verdict shall be read aloud by the clerk, and if in proper form and no juror dissents therefrom, and neither party requests to have the jury polled, the verdict shall be entered upon the minutes of the court."
8. SAME.—Article 712 of the Code of Criminal Procedure provides that "the verdict in every criminal case must be general; when there are special pleas upon which the jury are to find, they must say in their verdict that

the matters alleged in such pleas are true or untrue; where the plea is 'not guilty,' they must find that the defendant is either 'guilty' or 'not guilty;' and, in addition thereto, they shall assess the punishment in all cases where the same is not absolutely fixed by law to some particular penalty."

9. SAME.—Article 713 of the Code of Criminal Procedure provides that, "where a prosecution is for an offense consisting of different degrees, the jury may find the defendant not guilty of the higher degree (naming it), but guilty of any degree inferior to that charged in the indictment or information."

10. SAME.—The issue in a murder trial is *quasi special*, and it is an imperative statutory requirement that, in murder cases, the verdict, if it be guilty, shall find and declare whether it be of murder in the first or murder in the second degree, as well as the punishment to be assessed; and such declaration must be so clear and positive as to admit of no inference as to what was the degree of guilt pronounced or the punishment assessed. See the opinion *in extenso* for an elaboration of the question.

APPEAL from the District Court of Fayette. Tried below before the Hon. L. W. Moore.

Upon an indictment charging him with the murder of Antone Roerich, in Fayette county, Texas, on the eleventh day of August, 1882, the appellant was found guilty of murder in the "fist" degree, and the death penalty was assessed against him as punishment.

Doctor W. T. McLeary testified, for the State, that, on the night of the eleventh of August, 1882, he was called in to attend the deceased, Antone Roerich. Witness found him at his house in Fayette county, suffering from gun-shot wounds. The wounds, several in number, were made with buck shot, similar to those now exhibited to the witness. These, the witness thought, were the buck shot which he cut from the body of the deceased. The principal wound carried away the jaw of the deceased. Roerich died the same night from the effects of the wounds.

The State introduced an indictment against the defendant, charging him with carrying a pistol, and showing that the deceased was a witness on behalf of the State.

I. W. Hill, county attorney for Fayette county, testified that the defendant was the Ben Wooldridge charged to have carried the pistol referred to in the indictment, and the deceased was the Antone Roerich referred to as the State's witness. The case was called a few days before the killing of Roerich, and was continued by the defense, and since the death of Roerich it had

been dismissed by the witness because he could not convict without the testimony of Roerich.

Sam Monroe testified, for the State, that he and the deceased were witnesses subpœnaed to testify against the defendant in a prosecution for carrying a pistol, and for that purpose visited LaGrange to attend court on the Monday before the killing. During the day he saw the deceased and the defendant talking on the streets of LaGrange. Approaching them he heard the defendant say something to the deceased about a "d—d Dutch s—n of a b—h," and "if you don't look out you will never appear in court against me another time." The witness did not, of his own knowledge, know what the deceased and the defendant were talking about at the time, nor who the defendant was denouncing as a "d—d Dutch s—n of a b—h," though he was talking to the deceased, besides whom there was no one near. The defendant was not talking in a joking manner. When the witness and Roerich drove home that evening they traveled a long and unusual route.

John Moskow, a witness for the State, testified that he had been acquainted with both the defendant and the deceased, and lived at the house of the latter. Some two or three weeks before the killing, the defendant rode up to Roerich's house, and asked why he, Roerich, had indicted him. Roerich replied that the grand jury, and not he, had preferred the indictment. The defendant replied: "I will settle with you some time."

The witness was in his room, up stairs in the house of the deceased, on the night of the killing. He was sitting in undress, reading, some little time after Roerich and his wife had retired, and, while thus engaged, heard some one call, and heard deceased answer. Shortly Roerich came up stairs and told the witness that he would leave his lamp burning; that one of Fahrentholdt's children had fallen into a well, and that he, the deceased, and his wife were going to Fahrentholdt's. This was between nine and ten o'clock. He left, and in a short time the witness heard a shot fired, and in a few minutes another shot, followed by the screaming of Mrs. Roerich. He ran out without waiting to dress, and found the deceased lying in his yard, in a path leading from his house to his blacksmith shop, bleeding from a gun-shot wound. Roerich died the same night. The next morning the witness picked up a piece of wadding near the place where Roerich fell. It was a fragment of a light brown paper sack. He identified one of two pieces handed him as the

fragment he picked up. This piece of paper was in evidence before the coroner's inquest. The witness denied that in his testimony before the coroner's inquest he said that the conversation which he detailed at the beginning of his examination on this trial occurred between the deceased and the defendant, two months before the killing.

W. H. Perry, for the State, described the situation of the house and premises of the deceased, as follows: "His (deceased's) house is about seventy-five or a hundred yards from the front fence. There is a path leading from the house to the gate adjoining the blacksmith shop. The fence joins the back corner of the shop, and the side fence commences at the other back corner, and runs back, leaving the shop on the outside of the yard and forming part of the fence. A public road runs in front of the house and shop. This is the Weimar road. After this road passes the house a short distance, it intercepts a small road leading down to the colored Baptist church, and further on around to Mr. Fahrentholdt's house. From the house straight through to the church, the distance is some two hundred and fifty or three hundred yards. With the meanderings of the road this distance is about four hundred yards."

On the morning after the killing, the witness picked up, outside of the gate near the shop, and where the blood showed that the deceased was shot, a fragment of a light brown paper sack, which had been used as wadding. This was one of the two pieces of wadding which were used in evidence before the coroner's inquest next day. One of the two pieces now in court was used before the coroner's inquest. This the witness knew by the red half pound mark on it, but he could not say whether it was the piece found and brought by him, or the piece brought by some one else.

The witness found a foot track in the black soil near the gate, which was of easy impression. This track he covered carefully with a piece of an old plow, to prevent obliteration, and subsequently he and J. C. Taylor measured it. He subsequently applied the same measure to the defendant's foot, and found them to correspond exactly in length, the only manner in which he tested the foot. It was admitted by the State that the corner of the shop near which the track was found was not the corner from which the shooting was done.

August Farentholdt testified, for the State, that no child of his

fell into a well on the night of the killing of the deceased, nor did he send such word to the deceased.

John C. Taylor testified, for the State, that at the time of the killing the defendant was living on Ed. Adams's place, about two and a half miles from Roerich's place. The witness went to the defendant's place on the day after the shooting, and found a double-barreled shot gun on a rack in his room. It was unloaded, but, according to tests applied by the witness, both barrels proved to have been discharged within twenty-four hours. Neither tube was capped. In a shot sack hanging near the gun, the witness found the lower part of a light brown paper half pound sack, the same which was now in court. This witness took this to the coroner's inquest, and compared it with the two pieces of wadding. They were all of the same character of paper, the same in color and texture. On one piece of the wadding the figure $\frac{1}{2}$, in red ink, was printed.

George Wooldridge, a nephew of the defendant, testified, for the State, that on the morning of the day on which Roerich was killed, he, the witness, was sent by the defendant to Weimar to purchase five cents worth of buck shot, which the defendant directed him to give to Nathan Stevens. The witness bought the shot in Weimar at Mr. Hyer's store, receiving them in a light brown half pound paper sack, of the same color as the fragments in court. The witness, as directed, gave the shot and paper sack to Nathan Stevens and went to Will Williams's place, where he was engaged picking cotton.

Louis Osborne testified, for the State, that he was at the colored church when Roerich was killed. He heard the shots and went to Roerich's house. When he returned to the church the defendant was there. The witness did not see him about the church before the shooting, though, as the witness was then inside of the church, the defendant might have been about the church on the outside, and the witness not have seen him. The defendant was the moderator of the church. "A moderator is a person who attends to keeping down fusses and preventing disturbance and disorder."

Jesse Mann testified, for the State, that he was at the colored church when the killing of Roerich occurred. He did not see the defendant there before the shooting, though he looked for him somewhat. The defendant was the regular moderator, but in his absence Alex Mann officiated in that capacity that night.

He saw the defendant about the church once on that evening, after the shooting.

Mrs. Lizzie Roerich, the widow of the deceased, testified, for the State, that on the night of the eleventh of August, 1882, after she and her husband had retired, some one awakened her, calling from near the well. She aroused her husband and told him that some one was calling for him. He asked, "Who is it?" and she replied that it might possibly be some black man from the church come for a bucket of water. The witness looked through a window and saw a black man standing near the well. The dogs made so much noise what he said could not be heard, and the deceased told him to come nearer. The black man therefore approached the window, and, in reply to questions of the deceased as to who he was and what he wanted, he said that Mr. Fahrentholdt's little boy had fallen into a well, and that Fahrentholdt had sent for the deceased. The deceased replied to the man that he could return, and that he, the deceased, and the witness would presently go to Fahrentholdt's. The man, whom the witness could not recognize, retired, saying that he would await the deceased and the witness at the gate.

After dressing, the deceased and the witness started to Fahrentholdt's, and when they reached the shop, *en route,* the deceased called to the man and asked: "Are you here?" He received no answer, and repeated the call and question, and, receiving no answer, he remarked to the witness that he did not believe the story about the child falling into the well. He again called, however, and asked: "Are you gone?" To this, the man answered from the shop: "No, I am not gone." The witness thereupon asked: "Why did you not answer?" Receiving no reply, she repeated the question, and the man said: "I did not want to answer you right off."

The suspicions of the deceased seemed now aroused, and he again remarked to the witness that he did not believe anyone had fallen into a well, and supplemented this remark with, "I think I hear some one behind the shop." The witness proposed that, as no one would harm her, she would go around behind the shop. When the witness got around the shop, and near where the side fence joins the corner of the shop, a man jumped up from under a wagon. The witness called to the deceased to run, and as he started the man fired upon him. The deceased continued to run, and the man shot again, and the deceased fell. The man who shot the deceased was the defendant. The wit-

ness knew him well, had often seen him, and stood within four or five feet of him when he shot. She saw him plainly, and knew him to be Ben Wooldridge, the defendant. She would have recognized him among a hundred, and at court, afterwards, identified him from two others arrested for this crime as the man who killed the deceased. She was at no time near enough to recognize the man who called at the well and told the deceased that Fahrentholdt's child had fallen into the well. That man, however, was not the defendant.

W. H. Perry, recalled by the State, testified that at the time of Mrs. Roerich's first identification of the defendant, he, the witness, had four men under arrest, charged with the murder of the deceased, including the defendant and his brother, Booth Wooldridge. The witness asked Mrs. Roerich if either one of the four men were at or about her premises on the night of the killing. She pointed to the defendant, and said: "That is the man who killed my husband." This witness was the justice of the peace who held the inquest.

E. T. Adams testified, for the defense, that about noon on the twelfth of August, 1882, the day after the killing, he was told that the defendant wished to see him as soon as he returned home. He thereupon sent for the defendant, who came to him at his house. The defendant told the witness that some men to whom he did not wish to surrender were hunting for him, but that he desired to surrender to the officers of the county. He said that he was not afraid of a fair and impartial trial, but was afraid that, if taken by the parties who were seeking him, he would be mobbed. Immediately after dinner, the witness went with the defendant to Weimar, where the defendant surrendered to constable Hancock.

The defendant was a tenant on the farm of the witness, and to the knowledge of the witness both he and his brother Booth Wooldridge ploughed in the field all day, August 11, 1882, leaving off late in the evening. Frank Taylor told the witness that the defendant wanted to see him, and it was through Taylor that the witness sent for the defendant.

Frank Taylor testified, for the defense, that as he was leaving the cotton patch for dinner on the day after the killing he saw some one, whom he ascertained to be the defendant, motioning to him from some bushes. Approaching him, the witness asked, "What is the matter?" The defendant answered that he was accused of the murder of the deceased, and that he was keeping

out of the way of a searching party until he could see Mr. Adams, after which it was his purpose to surrender to the authorized officers. He requested the witness to ascertain for him if Mr. Adams had yet returned to his house from some point whither he had gone, and, if so, to request in his name the protection of Mr. Adams pending his surrender. Witness called on Mr. Adams as requested, and subsequently escorted the defendant to Adams's house, whence the defendant and Adams went to Weimar.

The defendant's brother, Booth Wooldridge, testified, in his behalf, that he and the defendant ploughed together in the same field all of the day of the killing, and he knew that the defendant did not leave the field at any time on that day. The witness left the defendant's house after sundown, at which time no one but the defendant and his wife were at the house. He saw neither George Wooldridge nor Nathan Stevens during the day, and was certain that neither of them were at the defendant's house when he left there at dark. The witness did not think that the defendant left his house at any time during that day, except to go to the field. The witness knew that during the day (August 11, 1882) the defendant discharged his gun at a large lizzard, but was not certain that he discharged both barrels.

The witness was at St. Paul's Church when the shooting occurred, and from there heard the reports. He saw the defendant about the church both before and after the shooting. He saw him just outside of the church about twenty or thirty minutes before the shooting, and again about fifteen or twenty minutes after the shooting. He was not blowing, nor did he appear tired or excited when the witness saw him this last time, but was walking around in the crowd as usual. He, the defendant, acted as moderator at the church that night, as he usually did. The witness saw nothing of Nathan Stevens at church that night. He saw the defendant walking home from church that night, and was positive that he had no gun. His gun was at home in the rack when the witness got home that night. Witness lived in the house with the defendant.

John Mann testified, for the defense, that about thirty minutes before the shooting he saw the defendant sitting in a wagon at St. Paul's Church. The witness rode up to the wagon on horseback, spoke to and shook hands with the defendant, and hitched his horse near the wagon. The defendant had no gun with him at that time. The defendant remarked that "they are very

slow about beginning services." He, defendant, was acting as moderator that night as usual. About twenty or thirty minutes after the shooting the witness again saw the defendant about the church. He did not then appear excited or tired as if from running.

George Hayden testified, for the defense, that he saw the defendant at the church both before and after the shooting, and walked a short distance with him on his return home. The defendant had no gun with him.

G. A. Finlay testified that she saw the defendant at the church after the shooting, and saw him going home with his wife. He had no gun with him.

B. Mitchell testified, for the defense, that he was at the church, and heard the shots at the time of the killing of Roerich. Quite a number of men were around outside of the church that night, but the witness did not remember that he saw the defendant about there before the shooting. Witness and others went to the place of the shooting as soon as the reports were heard, the witness on foot. He returned to the church as soon as Roerich was picked up and taken into the house. Within ten minutes after he reached the church, Brown Cook and the defendant drove up in a buggy from the direction of Fahrentholdt's. Cook proposed to go to Roerich's, but the witness advised Wooldridge, the defendant, not to go, as Mrs. Roerich accused him of the murder. The defendant did not go. After preaching the witness walked a part of the way home with the defendant, and was positive that he had no gun.

Brown Cook testified, for the defense, that he was at Fahrentholdt's house when the fatal shots were fired. He heard them, and thinking that they were fired at the church, some three hundred yards distant, he jumped into his buggy, which was standing ready, and drove toward the church in a run. Some sixty or seventy yards from the church, in the direction of Roerich's house, he met some horsemen, including one Jeff Davis, who halloed to him that Roerich had been killed dead. The witness turned and drove back to the church. As he drove up to the church the defendant called out: "Is that you, Brown?" He came up to the witness's buggy and got into it. He did not appear at all excited. Not more than five minutes had elapsed since the shooting. The witness first learned that the defendant was charged with the shooting after he got into the buggy. He heard a general inquiry for the defendant. The witness drove

to Fahrentholdt's with the defendant, and shortly returned with him to the church.

The written testimony of the State's witness John Moskow, taken at the coroner's inquest, was introduced and read. It recited that, in his testimony on that occasion, Moskow stated that the conversation between the defendant and the deceased concerning the indictment transpired two months before the shooting.

The motion for new trial raised the questions involved in the opinion of this court.

No brief for the appellant has reached the Reporters.

H. Chilton, Assistant Attorney General, for the State.

WHITE, P. J. On the night of the eleventh of August, 1882, Antone Roerich was assassinated at his home in Fayette county. Appellant and one Nathan Stevens were jointly indicted for the murder. On the twenty-fifth of November appellant was alone placed upon trial, and the result was his conviction of murder in the first degree, with the penalty assessed at death. From this judgment of conviction he appeals to this court.

Several supposed errors are complained of as grounds for a reversal of the judgment, the most important of which are: 1, that the court erred in overruling his application for a continuance; 2, error in refusing to give in charge to the jury special instructions requested in behalf of defendant upon the law of circumstantial evidence; and, 3, nullity of the verdict rendered by the jury.

Under our statute now in force, the granting or refusal of an application for continuance is a matter confided to the sound discretion of the trial judge, and is no longer, as formerly, even on the first application, a matter of right. (Code Crim. Proc., Art. 560, subdivision 6.) In revising the refusal of a continuance asked on account of absent witnesses, the evidence adduced at the trial is considered by this court, for the purpose of determining whether the desired testimony was probably true, as well as whether it was material, if true; and the materiality of the evidence must not only be shown, but the probability of its truth must also appear, before we would feel authorized to declare that the court below had abused its discretion. (*Dowdy* v. *The State*, 9 Texas Ct. App., 292.)

Of the four witnesses on account of whose absence the continuance in this case was sought, one (the witness Wheeler) was not a resident of the county, and due diligence is not shown to procure his attendance. Another (Josephine Wooldridge, wife of defendant) was sent for by the court, was present on the trial, but defendant declined and refused to place her upon the stand to testify to the facts which it was alleged could be proven by her. As far as this latter witness's testimony is concerned, defendant certainly has no just ground of complaint, since he had every opportunity to avail himself of it and did not do so. It is no reason or excuse for his action to say that he would not consent to have her testify unless the other witnesses named in his motion were also produced. And, if the statement in the motion for continuance be true, defendant could have proven all the facts which he expected the absent witnesses to establish by Josephine Wooldridge, for he says: "By the witness Josephine Wooldridge, defendant expects to prove all the facts above alledged (referring to the facts which he had just stated the other witnesses would prove), and, further, that she, the witness, is the wife of defendant, and that on the night of the alleged killing she walked from their home to the church with defendant, and that defendant carried no gun with him; that she also walked home with defendant from church on the same night, and that he had no gun with him at all that night."

According to this statement there was afterwards present in court a witness by whom defendant could actually have proven all the facts he wished and expected to prove by the absent witnesses, and yet he declined to put this witness on the stand, and now asks a reversal of the case because he was deprived of the testimony.

But suppose he could not have proven by Josephine Wooldridge what he alleges he could prove by these absent witnesses, the pertinent inquiry then would be, taken in connection with the testimony adduced, is the desired testimony probably true, even if the witnesses being present should swear as indicated? We are compelled to answer the question in the negative. It is stated in the application "that all three of the absent witnesses heard the report of the gun which is alleged to have killed said Roerich, and that at the time of the discharge of said gun this defendant was present at St. Paul's Church and engaged in conversation with said witnesses, some three hundred or four hundred yards from the place of the shooting, and that therefore

defendant could not have been the person who killed said Antone Roerich."

In the statement of facts it is shown that defendant was moderator of the church,—he was looked for that night,—a number of persons were present. Some four or five of those who were present at the church testified as witnesses on the trial for defendant, and whilst they all state that they saw him at the church both before and after the shooting, not a single one swears that he was there when the fatal shots were heard; nor is the evidence of any one of them inconsistent with the theory that he could and did commit the deed. On the other hand, upon his defense of *alibi*, to our minds the evidence of these witnesses, though negative in character, appears to be strongly confirmatory of his guilt. Under all the circumstances shown by the evidence before us, it is neither credible nor probably true that he was present at the church and conversing with the absent witnesses when the deed was committed; and so believing, we can not say that the action of the court in overruling the motion for a new trial, so far as it rested upon this ground, was erroneous.

Nor did the court err in refusing to give the requested special instructions upon circumstantial evidence in charge to the jury. There could be no more positive and direct testimony than that of the murdered man's wife as to the identity of the defendant and the fact that he fired the fatal shots which deprived her husband of his life. This was the main fact, and the circumstantial evidence adduced was consistent with and only in corroboration of it.

We come now to the consideration of the objections urged to the sufficiency and validity of the verdict. It is in these words, viz: "We the jury find the defendant Ben Wooldridge guilty of murder in *fist* degree, and assess the punishment at death."

Instead of the word "*first*" the jury have used the word "*fist*," or in spelling the word "first" have omitted the letter "r." This is the error contended for, *i. e.*, that the jury have not found the defendant guilty of murder in the *first* degree, and that consequently the judgment rendered was not warranted, nor is it supported by the verdict. Defendant presented the insufficiency of this verdict as one of the grounds of his motion for a new trial, which was overruled. A most serious question is here presented, and no case directly in point has been found in our own or the decisions of other courts of the country. We

must determine it by a fair and proper construction of our statutes relating to the subject matter, and by analogies drawn from well settled principles of the law. It is to be particularly noted that here we have no case of the misspelling of a word; the word used is "*fist*," is properly spelt "fist," and is a word as well defined and as well known to the English language as any other word in daily common use. It is further to be noted that this word "fist" is not pronounced, and cannot by any contortion of pronunciation be made to sound, like the word "first;" and consequently the well recognized doctrine of *idem sonans* is not applicable and must be eliminated from the discussion.

Now, what are the statutory and legal rules with regard to verdicts?

"A verdict is a declaration by a jury of their decision of the issues submitted to them in the case, and it must be in writing, and concurred in by each member of the jury." (Code Crim. Proc., Art. 705.) Three things are requisite: First, it must declare the issues; second, it must be in writing; third, it must be concurred in by all the jurymen.

Again: "When the jury have agreed upon a verdict they shall be brought into court by the proper officer, and if when asked they answer that they have agreed, the verdict shall be read aloud by the clerk, and if in proper form and no juror dissents therefrom, and neither party requests to have the jury polled, the verdict shall be entered upon the minutes of the court." (Code Crim. Proc., Art. 710.)

"The verdict in every criminal case must be general; when there are special pleas upon which the jury are to find, they must say in their verdict that the matters alleged in such pleas are true or untrue; where the plea is not guilty they must find that the defendant is either 'guilty,' or 'not guilty,' and in addition thereto they shall assess the punishment in all cases where the same is not absolutely fixed by law to some particular penalty." (Code Crim. Proc., Art. 712.)

"Where a prosecution is for an offense consisting of different degrees, the jury may find the defendant not guilty of the higher degree (naming it), but guilty of any degree inferior to that charged in the indictment or information." (Code Crim. Proc., Art. 713.)

These are the general statutory rules with regard to verdicts in all criminal cases of whatsoever character. As seen, it is expressly declared that "the verdict in every criminal case must

be general." What is meant by this? Simply that the verdict must find generally that defendant is "guilty" or "not guilty." Every verdict must ascertain and declare one or the other of these general issues—issues *general* because involved in all criminal cases. Beyond this general feature of the verdict in each particular case, the verdict may be said to be *quasi* special to the extent that it declares the special pleas of defendant (when interposed) "true" or "untrue," whenever it assesses a punishment, or in a prosecution for an offense consisting of different degrees, where it acquits of the higher and finds an inferior degree.

But, with regard to these general verdicts, and as applicable indiscriminately to all criminal cases (except murder, as we propose hereafter to show), certain rules of construction to test their validity have been adopted and settled by the courts. As, for instance, that "neither bad spelling nor ungrammatical findings of a jury will vitiate a verdict when the sense is clear." (*Koontz* v. *The State*, 41 Texas, 570; *Haney* v. *The State*, 2 Texas Ct. App., 504; *Krebs* v. *The State*, 3 Texas Ct. App., 349; *Taylor* v. *The State*, 5 Texas Ct. App., 569; *McCoy* v. *The State*, 7 Texas Ct. App., 379.) Yet in these cases if the verdict *is unintelligible* it will not be permitted to stand. (Id.) Other rules are, that in construing verdicts the object is to get at the meaning of the jury; that verdicts are to have a reasonable intendment, and to have a reasonable construction. They are not to be avoided unless from necessity originating in doubt of their import, or immateriality of the issue found, or of their manifest tendency to work injustice. And it is moreover said that a verdict is sufficient when the jury have clearly expressed an intention to find the accused guilty of the crime charged in the indictment, and to assess his punishment within the terms of the law. And so a verdict is sufficient if the judgment rendered upon it can be pleaded in bar of another prosecution for the same offense. (*Lindsey* v. *The State*, 1 Texas Ct. App., 327; *Williams* v. *The State*, 5 Texas Ct. App., 226; *Chester* v. *The State*, 1 Texas Ct. App., 703; *Bland* v. *The State*, 4 Texas Ct. App., 15; *McMillan* v. *The State*, 7 Texas Ct. App., 100; 1 Bish. Crim. Proc., § 1005.)

These rules are all well settled, and so far as they apply to criminal cases generally we do not pretend to controvert or deny them. As said above, however, every verdict in all criminal prosecutions must to some extent be a special finding. Suppose special pleas, for instance, have been interposed, and the jury,

though finding the defendant guilty, have failed to find the special plea to be "true" or "untrue." Would the verdict be sufficient, could and would the court be authorized to infer and conclude that they intended by finding him guilty to find, and that the verdict could only be reasonably construed to mean, that they must have found the special plea was untrue else they never could have found him guilty? By no means could such inference or intendment be indulged. Why? Because the statute is imperative that the verdict must say that the matters alleged in the plea are either "true" or "untrue." (Code Crim. Proc., Art. 712; *Denton* v. *The State*, 44 Texas, 446; *Taylor* v. *The State*, 4 Texas Ct. App., 40; *Brown* v. *The State*, 7 Texas Ct. App., 619.) Or suppose the jury should fail to impose the fine or assess the penalty where not absolutely fixed by law, would any court be authorized or warranted in holding the verdict sufficient, and in supplying the deficiency and awarding a punishment commensurate with the finding? We are apprised of no such authority derivable from our law. On the other hand such verdict would manifestly be insufficient under our laws to support a judgment imposing a fine or inflicting a punishment. Such a verdict would in fact be but a dead letter, a nullity to which nothing could give force or vitality.

So, then, it appears, that with regard to misdemeanors and ordinary felonies, there are certain matters which the verdict must also specifically declare, and which, if not declared, cannot be cured by intendment, inference or necessary deduction. And it will be seen that these matters, which are incurable if not found, and incapable of explanation if not certainly and explicitly found, are all those which, by law, are specifically and exclusively confided to the jury, and to them alone; and, in so far as they are thus confided, the verdict will be, and must be, treated as special with reference to them.

Now, let us see what differences, if any, exist in the rules above noted and those applicable to murder cases. At the very outset of the investigation, we are met with the statute which declares that, "If the jury shall find any person guilty of murder, they shall also find by their verdict whether it is of the first or second degree; and if any person shall plead guilty to an indictment for murder, a jury shall be summoned to find of what degree of murder he is guilty; and in either case they shall also find the punishment." (Penal Code, Art. 607.)

Language cannot well be stronger or more imperative: "They

shall also find by their verdict whether it (the murder) is of the first or second degree." In construing this statute, the leading case decided by our Supreme Court is *Buster* v. *The State*, 42 Texas, 315, wherein the verdict was: "We the jury find the defendant guilty as charged in the indictment and assess his punishment to be hung by the neck until dead." Moore, J., delivering the opinion of the court, says: "It must clearly appear from the verdict, not only that there is no conflict in the finding of the jury on the issue of the guilt and the assessment of the penalty, but their determination in the one must be in harmony with, and supported by, that in the other. To support the judgment, the court must be able to see from the verdict of 'guilty' returned by the jury that it authorizes and requires the assessment of a penalty affixed by law, or that the penalty assessed by the jury is warranted by law; and, also that the jury are not mistaken in the character or degree of the offense of which they have in fact found the defendant guilty, and imposed a penalty not affixed to it by law. How can the court know this unless the verdict finds the offense, or its degree, as well as the penalty? It is but arguing in a circle to say the jury have found the defendant guilty of murder in the first degree because they have fixed the penalty of death, and that they were warranted in assessing the punishment of death because they found him guilty of murder in that degree. * * * * Unless the defendant is found guilty of murder in the first degree, the court, as we have said, cannot say they have not assessed a penalty not warranted. To guard against the possibility of such a result, and to prevent the commutation, by juries, of the penalties fixed by law, had, no doubt, great force in inducing the Legislature to require juries to find the degree of the offense in their verdicts, as well as assess the penalty in those cases in which this duty is confided to them. But, whatever may have been the motive for its enactment, thus it is plainly written in the code, and, until altered and repealed, it is evidently the duty of the court to observe and enforce it." All the authorities in our State (except *Holland* v. *The State*, 38 Texas, 474, which has been overruled), hold, as in Buster's case, that in a murder trial the verdict of conviction must specify the degree. (Clark's Crim. Law, p. 214, note "Verdict.")

In all the other States where the statute requires that the verdict shall find the degree in murder cases (with the exception of New York alone, perhaps), a similar construction has been adopted

to that enunciated in Buster's case, as above quoted.   Mr. Bishop says:   "The view sustained by most of the authorities, and probably best in accord with the reason of the thing, is that the Legislature meant by this provision to make sure of the jury's taking into their special consideration the distinguishing features of the degrees and passing thereon.   Hence this provision is in the full sense mandatory; and unless they find the degree in a manner patent on the face of the verdict, without help from the particular terms of the indictment, it is void.   No judgment can be rendered thereon, but a second trial must be ordered.   (2 Bish. Crim. Proc., § 595, and note with authorities cited.)

Our conclusion from these authorities is that in murder cases the jury are absolutely required to find the degree if they ascertain the accused to be guilty, and that in so far as finding the degree is concerned the verdict is special in its nature as contradistinguished from the rules governing and controlling general verdicts.   The characteristic distinction and difference between these two classes of verdicts may be concisely stated thus, viz: A general verdict is so called because the whole matter in issue is found generally; a special verdict is so called because some matter of fact is thereby found specially.   (10 Bac. Abrid., 308–9.)   The degree, that is the specific degree, is a matter of fact specially required in murder verdicts.

Now what are the rules of construction with regard to special verdicts?   In *The State* v. *Belk,* 76 N. C., 10, it is said: "It is familiar law that nothing can be added to a special verdict by inference.   If it omits to set forth any fact essential to constitute the offense charged, it is defective."   In *The State* v. *Blue,* 84 N. C., 807, it is said: "In finding a special verdict the facts should be stated fully and explicitly, and the omission of any fact necessary to constitute the offense is fatal.   The practice is when the verdict is insufficient, insensible, or in violent antagonism to the evidence, to set it aside and grant a new trial." (Citing 3 Whart. Cr. L., § 3188; *The State* v. *Wallace,* 3 Ind., 195; *The State* v. *Lowry,* 74 N. C., 121.)   In *The State* v. *Custer,* 65 N. C., 56, it is said: "In Hawkins's Pleas of the Crown, vol. 2, p. 622, one of his twelve points said to be settled is as follows, 'that the court judging upon a special verdict is confined to the facts expressly found, and cannot supply the want thereof as to any material part thereof, by an agreement or implication from what is expressly found.'   *   *   *   In Hawkins's Pleas of the Crown, p. 622, note 2, it is said, 'if the verdict do not sufficiently

ascertain the fact, a *venire de novo* ought to issue;' and so are other authorities." (S. C., 2 Crim. L. Repts., Greenl., 748.)

In *Levison* v. *The State*, 54 Ala., 520, it is said: "It has been uniformly decided that under an indictment for murder a judgment of conviction cannot be rendered on a verdict of guilty which does not expressly find the degree of the crime. (16 Ala., 781; 40 Ala., 698; 42 Ala., 509; 48 Ala., 52.) In *Johnson* v. *The State*, 17 Ala., 618, it was held that 'the rule was not varied because the indictment charged that the murder was by poisoning.' We do not doubt the correctness of these decisions; they are in conformity to the imperative terms of the statute, and no arguments drawn from the objects it is supposed the statute was intended to accomplish can justify a departure from them." (Citing Whart. Hom., p. 197; *The People* v. *Caldwell*, 40 Cal., 137.)

In *Clay* v. *The State*, 43 Ala., 350, it was held that "a special verdict cannot be aided by intendment, or by reference to any extrinsic fact appearing in the record. In such a case the court should arrest the judgment on motion of the accused, and order a *venire facias de novo* to be awarded."

The same court, in *Weatherford* v. *The State*, say: "But why speculate about this matter? The wiser and safer course is to do just what the law requires, and to do it in the way the law requires. We have determined at this term, in the case of *Edgar* v. *The State*, a case very like this, that the jury must by their verdict determine both the character and the extent of the punishment." (43 Ala., 319. See also 42 Ala., 509.)

When we apply these plain and well settled rules to the verdict before us, what is the inevitable conclusion which forces itself upon us as to its sufficiency, measured by analogy with these standards of the law? Have the jury found defendant guilty of murder in the *first* degree? To enable us to so hold, we must strike from the verdict a word which they have plainly spelled—a word in every day use in our language—and substitute in its place another and entirely different word, which we only infer they must have intended instead of the one they have used. Can we do this? If so, then we can take the same liberty with any other word used. If courts can be allowed to indulge in such inferences and intendments in cases involving the life and liberty of the citizen, then why have the inestimable right of trial by jury at all? If the court can substitute a verdict which the jury have not found, or find one when they have found none at all, then why have a jury? Why not let the court

find the entire verdict without the intervention of a jury? If the jury are required to declare the issues found in their verdict then, unless the issues are found by them, the verdict is not theirs. There must be no doubt to be supplied by mere intendment or inference, when the life of a human being is dependent upon it. This court will not assume such responsibility whilst the law fixes the determination of the issue alone in the breasts and consciences of twelve jurymen of the country. We may be satisfied of defendant's guilt of murder in the first degree, and we may be satisfied the jury so intended to find, but until they have so expressly found we cannot give our sanction that human life shall be taken whilst there is any uncertainty with regard to it. The jury have not expressly found it in this case. Their verdict is not only uncertain, but unintelligible and senseless. Even *idem sonans* will not aid it. It finds defendant simply guilty, without finding the degree, and such a verdict by all the authorities is held insufficient.

But it may be said the verdict ought to stand because, when the jury brought and returned it into court it was evidently read "*first degree*" by the clerk, and assented to by the jury as thus read. It seems they have some such rule of receiving and construing and doctoring up written verdicts over in Louisiana, but the reason why they assume such authority in that State is stated in the case of *The State* v. *Ross*, 32 La. Ann., 854. In that case it was held that the verdict of the jury is not illegal and null because written, "guilty without capitel parnish," when read aloud and distinctly announced by the clerk as "guilty without capital punishment." "Besides, the law does not require, even in cases of capital punishment, that the jury should reduce their verdict to writing." Here, as we have seen, the verdict must be in writing, and the Louisiana rule can not be invoked.

In conclusion, we hold that the verdict in this case is a nullity—the jury have not found the degree of murder of which defendant was guilty. This the law requires they shall do. If defendant is to hang, let him hang according to law. Passing upon a defective verdict of similar character, the Supreme Court of California, in *The People* v. *Ah Gow*, say: "It is difficult to find any justification or excuse for the entry of such a verdict. The court may in any case instruct the jury as to the form of their verdict, and if it appears from their verdict as first returned that they do not know the proper form, it is the duty of the court

to instruct them in that regard, and direct them to return the verdict in such form that the judgment of the law may thereupon be pronounced. Mr. Bishop says: 'It seems quite plain that in every case of a verdict rendered the judge, or prosecuting officer, or both, should look after its form and its substance so far as to prevent a doubtful or insufficient finding from passing into the records of the court, to create embarrassment afterward, and perhaps the necessity of a new trial. The want of precaution in that matter has led to many adjudications for which the occasion ought never to have been furnished.'" (2 Bish. Crim. Proc., § 831; 53 Cal., 627.)

Because the verdict in this case is insufficient and does not support the judgment rendered, the judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

Hurt, J., dissents.

Opinion delivered February 10, 1883.